ZALMON S. BOOTH, STEPHEN B. MASTERS ET AL. ADS. JOSEPH H. WONDERLY, SURVIVING PARTNER OF POTTER & CO.

1. A fire insurance company cannot be established in Jersey City instead of Trenton, under a charter for such a company to be located in Trenton. It is a perversion of, and a fraud upon, the act, and gives no corporate color to the company for the protection of those who

were engaged in, or lent themselves knowingly to the scheme. Such an organization in Jersey City is entirely outside of the act, and has no existence as a corporation, *real* or *de facto*.

2. A policy issued by such a company in Jersey City can be enforced against the directors personally, where they consented to become directors, or knowingly allowed themselves to be held out to the world as such.

On rule to show cause allowed by the judge at the circuit.

For the rule, *J. Dixon*.

Contra, *S. B. Ransom*.

The opinion of the court was delivered by

BEDLE, J. This suit was brought against Booth, Masters and others, as insurers, on a policy issued May 4th, 1868, in the name of, and by a company called the Mariners' Insurance Company, to Potter & Co., the same being signed by J. Jackson, president, and S. Chandler, assistant secretary. The property insured was in Pennsylvania, and consisted of a building and machinery used as a saw and planing mill and sash factory. The policy was issued at the office of the company in Jersey City, the insurance having been effected in behalf of Potter & Co. by an insurance agent at that place. The property was burned June 10th, 1868. The verdict was for the plaintiff, against some of the defendants, including Booth and Masters, and this rule was obtained by these two. The liability of the defendants was sought on the ground that the company was unincorporated, and that the defendants were the real principals; or if Booth and Masters were not principals by actual arrangement, that they consented, or allowed themselves to be made directors, and to be held out to the public as such, and the business of insurance to be carried on under their authority, real or apparent.

The company was organized about in January, 1868, and survived till in August of the same year, when it collapsed without assets. It was evidently a fraudulent concern, set up and manipulated by two or three chief managers; but the

just conclusion from the evidence is, that the two defendants named were not guilty of intentional fraud, although they may have been so far complicated as to make themselves liable for the contracts of the company.

The company had some semblance of a corporation, in name, form of organization, and assumption of a seal, yet not enough to give it a *de facto* corporate existence. The policy does not mention the company as incorporated. They issued business cards, giving the name of the company and a list of directors (being the defendants in this cause), besides the names of persons as president, vice-president, secretary, and assistant secretary, but making no mention of an incorporation. These cards and the policy, in appearance, were not necessarily inconsistent with an unincorporated company, yet they had a corporate color. But, behind all this, the case developed an effort to make out of it at least a *de facto* corporation. The chief mover in the fraud was a man by the name of Logan, who bargained with another, Thomas W. Noble, for the purchase of a charter of a corporation passed March 17th, 1865, to be called "The Mariners' Mutual Insurance Company." This charter was intended by the legislature for a local corporation at Trenton. It provides that the operations and business of the corporation shall be carried on and conducted at Trenton, and also that the directors shall be elected there. It also was intended that the corporation should be a mutual insurance company, and the directors are required to be members, but with the right to make *especial* insurances without the insured becoming members, if they so desired. It also provided that before commencing operations upon other than a mutual plan, a cash capital of $50,000 should be paid in. This charter seems to have been in the market at Trenton, without any organization under it, up to the time of the bargain between Logan and Noble. No connection was shown in any way between the corporators named in it and Noble, or those who attempted to organize under it in Jersey City. As the evidence stands, there was no organization in Trenton, no stock subscribed or paid in,

or any effort to do business there at any time. There was a meeting at Trenton at the time Logan made the purchase, at which Noble says Logan, Masters, Booth, and himself, and, he thinks, two others, were present. Not one of them a corporator named in the act. This, Noble says, was an informal gathering, and that he and Logan had some talk about an organization of the company, but that an organization was not perfected. The evidence shows that nothing was done there at that meeting towards any organization at Trenton, either by an election of directors, subscription to stock, or otherwise, but that Logan and Noble, at least, expected and intended that the company should be organized and established in Jersey City. In furtherance of this idea, a meeting was afterwards held in Jersey City, at which the company was formed, or organized, and persons selected by Logan, in some way not exactly clear, as directors. Among those selected were Booth and Masters. Noble attended this meeting, and consented, as he says, to act as a sort of secretary for the organization of the company, and held on to the office nominally until he got his pay for the charter—about $500. The fair result of the evidence is, that there was no stock *bona fide* subscribed or paid in, and doubtful if any nominally subscribed. The name assumed was not the name in the charter—the word *Mutual* being left out—the evident reason for that being, that it was intended to organize the company on a stock basis, or pretence, the mutual system not comporting with the design of the undertaking. Without referring further to the evidence, the case showed an effort to get control of this local charter, and pervert it from the purpose intended by the legislature. The intention of the scheme was to establish this company at Jersey City, and give it a corporate color by means of this local act. This charter belongs to that class of acts for private corporations peculiarly of a local character, as banks, savings, and like institutions, which are intended to be established and conducted in certain localities. It would be just as legal to attempt to locate a savings bank in Camden, under an act for one in Jersey City, as to establish an insurance

company in Jersey City under this charter. What the legislature intended in this particular act, is a question of construction merely, and there can be no doubt that The Mariners' Mutual Insurance Company contemplated by that act, was intended to be peculiarly a Trenton institution. To attempt to establish it in Jersey City was a palpable and entire perversion of the object of the act, and must be held to be void. It gave no corporate color to the company that the courts should recognize for the protection of those who were engaged in, or who lent themselves knowingly to the scheme. It was a fraud upon the act. *Hill* v. *Beach*, 1 *Beasley* 36. The doctrine that the organization cannot be inquired into collaterally, has no application as the case stands, because the charter does not fit this company, and was not intended for it. The organization is entirely outside of the act, and has no existence as a corporation, real or *de facto*. The extent to which a corporate body under such a charter may contract in other places than where located, is not in the case, with its present aspect. This is a question of power merely, while the question before us now is one of corporate existence. That the company were unincorporated, the court was warranted in assuming under the case as it appeared at the trial. The other ground of liability was, that the defendants were either the principals in fact in the formation of the company and its business, or that Booth and Masters consented, or knowingly allowed themselves to be used as such, or as directors, and the business to be done under their authority as directors, real or apparent. This policy was issued at the office of the company in Jersey City, in the course of their business, and within the scope of the directors' control and management. The business of the company was to make insurances, and the office of the directors was such, as that the authority and management must necessarily be with the directors. This part of the case rests upon two grounds, one whether Booth and Masters were actually members of the company ; the other, whether they consented to become directors, or knowingly allowed themselves to be held out to

the world as such. The company being unincorporated there was no principal to whom resort could be had, unless the directors are regarded as principals. The evidence shows that the liability of these two defendants was sought chiefly on the second ground, and there are two principles of law upon which that liability may be founded. One is, that if an agent contracts, although 'as agent without a legally responsible principal to whom resort may be had, the law presumes that he contracts on his personal responsibility, and intends to ॢbind himself, and so holds him, for in no other way could the contract have any validity. *Story on Agency*, §§ 280, 281, 282 ; 2 *Kent Com.* 630 ; *Dunlap's Paley on Agency* 374 ; *Kelner* v. *Baxter*, *L. R.*, 2 *C. P.* 174 ; *Furnivall* v. *Coombes*, 5 *M. & G.* 736 ; *Bay* v. *Cook*, 2 *Zab.* 343.

And that liability may be founded directly upon the contract, unless there is something in its terms making it necessary to proceed specially for contracting without authority. There is no difficulty in founding the action directly upon this policy.

The other principle is the familiar one that when one of two innocent parties must suffer by the fraud of a third, he who gave the occasion for the fraud or the means of credit, should bear the loss. This is founded on public policy and is necessary to prevent frauds. In this case there is no pretence of any credit in the making of the contract having been given by Potter & Co., or on their behalf to any existing principal. The insurance was effected by the agent for them, he supposing it was an incorporated company, and, besides, he had received from Logan the business cards of the company, with the names of Booth and Masters on as directors, whom he knew, and which had, as he says, some influence in making the insurance with that company. In England, when a joint stock company is in the preliminary stages of formation, before an act of incorporation is had, or complete registration effected under the companies clauses acts, and where there is a preliminary board of directors, those who have consented to become directors, or knowingly

allowed themselves to be held out to the world as directors, are responsible, as principals or partners, for all contracts, express or implied, within the scope of the business of the direction. *Fox* v. *Clifton* 9 *Bing.* 115; *Maddick* v. *Marshall*, 16 *C. B. (N. S.)* 387; *S. C. in Exch.*, 17 *Ib.* 828; *Collingwood* v. *Berkeley*, 15 *Ib.* 145; *Bell* v. *Francis*, 9 *C. & P.* 66; *Collyer on Part.*, § 1086.

The liability is that of partners, and the doctrine of these cases, as they stand, is applicable to this kind of an operation and all other kindred schemes of speculation, adventure, or fraud.

It is not intended to discuss the facts pertaining to this part of the case. The evidence is not free from difficulty, as to the two defendants. It is sufficient however to say that the verdict is sustainable upon the evidence, but inasmuch as a new trial will result for another reason, it is entirely satisfactory that the facts will be again passed upon by the jury.

None of the other grounds urged for a new trial are sufficient, except that in reference to the preliminary proofs. The defects of the evidence in that respect, can probably be remedied on another trial. As the case now stands there should be a new trial for this reason alone.

NOTE. The opinion in this case was delivered at the February Term, 1871; it was not filed until February Term, 1874. The case was retried at the Hudson Circuit and a verdict again obtained by the plaintiff, upon which judgment was entered accordingly.